UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| CLARISSA ANN SULOK, | ) | |
| --- | --- | --- |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 3:17-CV-450 JD |
| | ) | |
| NANCY A. BERRYHILL, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Plaintiff Clarissa Ann Sulok appeals the denial of her claim for Social Security Disability Insurance Benefits. For the following reasons, the Court remands this matter to the Commissioner for further proceedings consistent with this opinion.

## BACKGROUND

Ms. Sulok filed her initial application for benefits on October 15, 2013, alleging disability beginning October 13 of that same year. Her application was denied initially, on reconsideration, and following an administrative hearing in February 2016 at which she was represented by counsel. At that hearing, the ALJ heard testimony from Ms. Sulok and vocational expert Carrie Anderson. The ALJ found that Ms. Sulok had some severe impairments but could still perform certain jobs available in the national and regional economy, and she was therefore not disabled within the meaning of the Act. See 20 C.F.R. § 416.920(g). The Appeals Council denied review of the ALJ decision, making the ALJ's decision the final determination of the Commissioner.

## STANDARD OF REVIEW

Because the Appeals Council denied review, the Court evaluates the ALJ's decision as the final word of the Commissioner of Social Security. *Schomas v. Colvin*, 732 F.3d 702, 707 (7th Cir. 2013). The Court will affirm the Commissioner's denial of disability benefits if it is supported by substantial evidence. *Craft v. Astrue,* 539 F.3d 668, 673 (7th Cir. 2008). Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971). It must be "more than a scintilla but may be less than a preponderance." *Skinner v. Astrue,* 478 F.3d 836, 841 (7th Cir. 2007). Thus, even if "reasonable minds could differ" about the disability status of the claimant, the Court will affirm the Commissioner's decision as long as it is adequately supported. *Elder v. Astrue,* 529 F.3d 408, 413 (7th Cir. 2008).

In this substantial-evidence determination, the Court does not reweigh evidence, resolve conflicts, decide questions of credibility or substitute the Court's own judgment for that of the Commissioner. *Lopez v. Barnhart,* 336 F.3d 535, 539 (7th Cir. 2003). The Court does, however, critically review the record to ensure that the ALJ's decision is supported by the evidence and contains an adequate discussion of the issues. *Id.* The ALJ must evaluate both the evidence favoring the claimant as well as the evidence favoring the claim's rejection; he may not ignore an entire line of evidence that is contrary to his findings. *Zurawski v. Halter,* 245 F.3d 881, 887 (7th Cir. 2001). The ALJ must also "articulate at some minimal level his analysis of the evidence" to permit informed review. *Id.* Ultimately, while the ALJ is not required to address every piece of evidence or testimony presented, he must provide a "logical bridge" between the evidence and his conclusions. *Terry v. Astrue,* 580 F.3d 471, 475 (7th Cir. 2009).

**DISCUSSION**

Disability benefits are available only to individuals who are disabled under the terms of the Social Security Act. *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998). A claimant is disabled if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Social Security regulations contain a five-step test to ascertain whether the claimant has established a disability. 20 C.F.R. § 404.1520(a)(4). These steps require the Court to sequentially determine:

1. Whether the claimant is currently engaged in substantial gainful activity;

2. Whether the claimant has a medically severe impairment;

3. Whether the claimant's impairment meets or equals one listed in the regulations;

4. Whether the claimant can still perform relevant past work; and

5. Whether the claimant can perform other work in the community.

20 C.F.R. § 404.1520(a)(4); *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). At step three, if the ALJ determines that the claimant's impairment or combination of impairments meets or equals an impairment listed in the regulations, the Commissioner acknowledges disability. 20 C.F.R. § 404.1520(a)(4)(iii). However, if a listing is not met or equaled, the ALJ must assess the claimant's residual functional capacity ("RFC") between steps three and four. The RFC is then used to determine whether the claimant can perform past work under step four and whether the claimant can perform other work in society at step five. 20 C.F.R. § 404.1520(e). The claimant has the burden of proof in steps one through four, while the burden shifts to the Commissioner at step five to show that there are a significant number of jobs in the

national economy that the claimant is capable of performing. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004).

Ms. Sulok now challenges the ALJ's determination that her impairments could reasonably be expected to cause some of her alleged symptoms, but that her statements concerning the intensity, persistence, and limiting effects of these symptoms were not consistent with the record.[1] (R. 28). "So long as an ALJ gives specific reasons supported by the record," the Court will not overturn his credibility determination unless it is "patently wrong." *Curvin v. Colvin*, 778 F.3d 645, 651 (7th Cir. 2015). The ALJ's decision must, however, provide specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and must be sufficiently specific or clearly articulated so the individual and any subsequent reviewers can assess how the adjudicator evaluated the symptoms. SSR 16-3p[2] (superseding SSR 96-7p); *see also Pepper v. Colvin*, 712 F.3d 351, 367 (7th Cir. 2013) ("[A]n ALJ must adequately explain his credibility finding by discussing specific reasons supported by the record."). An ALJ's failure to give specific reasons for a credibility finding, supported by substantial evidence, is grounds for remand. *Id.*; *Myles v. Astrue*, 582 F.3d 672, 676 (7th Cir. 2009). Here, while the ALJ listed several reasons for his finding regarding Ms. Sulok's

---

[1] Ms. Sulok also argues that the ALJ improperly assigned "little weight" to the opinion of one of her treating physicians, Dr. Katherine Lisoni. However, the Court need not address this argument due to the fatal flaws in the ALJ's opinion discussed herein. Ms. Sulok is of course free to pursue her treating physician argument on remand.

[2] On the very same day the ALJ signed his written opinion in this case, the Social Security Administration issued SSR 16-3p, which supersedes SSR 96-7p. SSR 16-3p, 2016 WL 1119029 (March 16, 2016). SSR 96-7p referred to a claimant's "credibility," but SSR 16-3p removed that term in order to "clarify that subjective symptom evaluation is not an examination of the individual's character." SSR 16-3p, 2016 WL 1119029, at *1. Rather, the ALJs are reminded to "consider all of the evidence in an individual's record when they evaluate the intensity and persistence of symptoms after they find that the individual has a medically determinable impairment(s) that could reasonably be expected to produce those symptoms," as consistent with the regulations. *Id.* Under either SSR version the outcome in this case would be the same.

subjective complaints, he nonetheless failed to support those reasons with sufficient explanation or support from the record as a whole. Therefore, this case must be remanded.

A.      **Working Despite Impairments**

The ALJ first discredited Ms. Sulok's allegations on the grounds that she "suffered from [her] impairments for years and she has been able to do work. The only reason she stopped working was that she was laid off." (R. 31). In other words, the ALJ's rationale for discounting Ms. Sulok's allegations is that she has been able to work despite her impairments. *See id.* But the ALJ's statements here are unaccompanied by any analysis, if not belied by the record. For example, the ALJ erred in discounting Ms. Sulok's subjective complaints based on his observation that she "suffered from these impairments for years" but kept working. (R. 31). The ALJ's reasoning relies on the assumption that Ms. Sulok's overall condition remained the same throughout those years, and that it remains the same today such that she can still work.

True, the record shows that Ms. Sulok maintained employment while living under multiple diagnoses, some of which were even found to be severe by the ALJ.[3] Most relevant here, the ALJ noted that Ms. Sulok started experiencing bilateral shoulder pain (concentrated in the right shoulder) in 2009. (R. 28, 383). She informed her physician that she developed this pain while lifting heavy items as part of her job as a cook. (R. 383). From 2009 until mid-late 2012, Ms. Sulok described this shoulder pain as merely "annoying" and nothing indicates that she could not work through it during *those* years. (R. 282). But, in September 2012, she slipped at work and caught herself, injuring her right shoulder. *Id.* This caused a "*significant increase* in right shoulder pain," even at rest, which was thereafter further exacerbated by "any strenuous

---

[3] The ALJ recounted that Ms. Sulok was diagnosed with arthritis of the back, neck, and knees in 1981. (R. 29). She was also diagnosed with carpal tunnel syndrome in 1975 and underwent a bilateral carpal tunnel release surgery in 1993. (R. 28-29, 284). Her carpal tunnel syndrome was found to be non-severe by the ALJ. (R. 25). In addition, Ms. Sulok's severe impairment of fibromyalgia was diagnosed in 2011. (R. 29, 332).

activities, particularly overhead and pushing and pulling activities." *Id.* (emphasis added). A subsequent MRI of her right shoulder showed a "massive," complete tear of her rotator cuff, and, after maximizing her nonsurgical treatment options, Ms. Sulok elected to undergo an operation in October 2012 to repair this injury. (R. 312, 426).

After her October 2012 surgery, Ms. Sulok had been progressing well with outpatient physical therapy until she suffered another fall in February 2013 and reinjured her right shoulder. (R. 264). More or less, this second fall undid much of the progress Ms. Sulok had made following her 2012 shoulder injury, as an MRI conducted in May 2013 revealed a "recurrent massive full-thickness tear" of her right rotator cuff. (R. 310, 316). Ms. Sulok did not seek surgical treatment for this recurrent tear. This was a "quality of life decision." (R.252) Indeed, her treating physician informed her that "this massive rotator cuff tendon tear may not be amendable to primary care due to its massive size and the present tendinopathy of the rotator cuff tendon complex."*Id*. To make her shoulder matters even worse, an MRI conducted in August or September 2013 revealed a new tear of Ms. Sulok's left rotator cuff. (R. 377-79). She stopped working on October 12, 2013.

While the ALJ provided nearly three full pages summarizing Ms. Sulok's medical history, he offered no explanation as to *why* Ms. Sulok's more recent shoulder injuries did not render her more physically limited than before. And because the ALJ concluded that Ms. Sulok had been working through her impairments, such an explanation is necessary in order to justify the ALJ's reliance on the underlying assumption that her condition did not worsen. Thus, the ALJ failed to provide the requisite "logical bridge" to connect the evidence to his conclusion regarding Ms. Sulok's ability to work. *Terry*, 580 F.3d at 475.

activities, particularly overhead and pushing and pulling activities." *Id.* (emphasis added). A subsequent MRI of her right shoulder showed a "massive," complete tear of her rotator cuff, and, after maximizing her nonsurgical treatment options, Ms. Sulok elected to undergo an operation in October 2012 to repair this injury. (R. 312, 426).

After her October 2012 surgery, Ms. Sulok had been progressing well with outpatient physical therapy until she suffered another fall in February 2013 and reinjured her right shoulder. (R. 264). More or less, this second fall undid much of the progress Ms. Sulok had made following her 2012 shoulder injury, as an MRI conducted in May 2013 revealed a "recurrent massive full-thickness tear" of her right rotator cuff. (R. 310, 316). Ms. Sulok did not seek surgical treatment for this recurrent tear. This was a "quality of life decision." (R.252) Indeed, her treating physician informed her that "this massive rotator cuff tendon tear may not be amendable to primary care due to its massive size and the present tendinopathy of the rotator cuff tendon complex."*Id*. To make her shoulder matters even worse, an MRI conducted in August or September 2013 revealed a new tear of Ms. Sulok's left rotator cuff. (R. 377-79). She stopped working on October 12, 2013.

While the ALJ provided nearly three full pages summarizing Ms. Sulok's medical history, he offered no explanation as to *why* Ms. Sulok's more recent shoulder injuries did not render her more physically limited than before. And because the ALJ concluded that Ms. Sulok had been working through her impairments, such an explanation is necessary in order to justify the ALJ's reliance on the underlying assumption that her condition did not worsen. Thus, the ALJ failed to provide the requisite "logical bridge" to connect the evidence to his conclusion regarding Ms. Sulok's ability to work. *Terry*, 580 F.3d at 475.

The ALJ's failure to take the effects of Ms. Sulok's shoulder injuries into account coincides with (and perhaps led to) his unfounded characterization of her termination. Notably, the ALJ wholly ignores the reasons Ms. Sulok supplied as to why she was laid off. At the hearing, Ms. Sulok testified that she worked as a head cook for her family's business, which required constant pivoting, stretching, lifting heavy pans, and reaching. (R. 43-44). However, by October 12, 2013 (the alleged onset date), she could not perform her everyday activities without being in "excruciating pain;" she simply "couldn't do what [she] needed to do to work there." (R. 45). By stating that "the only reason [Ms. Sulok] stopped working was that she was laid off," the ALJ impermissibly omitted these reasons and left a misleading evidentiary gap that implies Ms. Sulok was terminated on some other, less sympathetic grounds – and even if true, the ALJ cites no such reasons. The ALJ improperly discussed only the details that backed his conclusion regarding Ms. Sulok's subjective complaints, while neglecting to mention competing testimony that supported her allegations. *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) (An ALJ cannot "cherry-pick" facts that support a finding of non-disability while ignoring evidence that points to a disability finding.). These errors require remand.

**B.** **Application for Unemployment Benefits**

Second, the ALJ discounted Ms. Sulok's claimed inability to work based in part on the fact that she unsuccessfully applied for unemployment benefits after losing her job. (R. 31). In so doing, the ALJ offered only the following explanation: "She tried obtaining unemployment, which means she had to attest to the State that she was able and willing of working." *Id.* According to the ALJ, this meant that Ms. Sulok "is able to work if she wanted to." *Id.* However, the ALJ reached this conclusion without making any effort to explore the circumstances of Ms. Sulok's situation. The Seventh Circuit has cautioned that "attributing a lack of credibility to [a

claimant's application for unemployment benefits] is a step that must be taken with significant care and circumspection. All of the surrounding facts must be carefully considered." *Scrogham v. Colvin*, 765 F.3d 685, 699 (7th Cir. 2014) (remanding where the ALJ did not discuss any circumstantial considerations surrounding claimant's unemployment benefits). The ALJ in this case made no effort to explain his consideration of Ms. Sulok's application for unemployment benefits with the "care and circumspection" required by *Scrogham*; the ALJ neither questioned Ms. Sulok about her benefits at the hearing, nor explored any potential connection between Ms. Sulok's condition and her need for benefits. This omission is significant, because while Ms. Sulok's certification statement may be inconsistent, her "purported belief about her ability to perform some degree of work is not necessarily coextensive with her actual ability to perform that degree of work, or her actual ability to sustain full-time employment." *Schickel v. Colvin*, No. 14 C 5763, 2015 WL 8481964, at *14 (N.D. Ill. Dec. 10, 2015). Furthermore, "a person who is not certain whether [she] will qualify for Social Security disability surely has, *and should have*, a strong incentive to keep looking for work and to pursue unemployment compensation as an interim source of income."). *Lambert v. Berryhill*, No. 17-1627, 2018 WL 3470994, at *7 (7th Cir. July 19, 2018) (emphasis in the original). "An ALJ should not discount a claimant's credibility based on an application for unemployment compensation without taking these incentives and pressures into account." *Id.* The ALJ's opinion here does not indicate that he did, and this shortcoming provides an independent basis for remand. *See Schickel*, 2015 WL 8481964 (remanding where ALJ singled out claimant's application for unemployment benefits without exploring said application at the hearing and omitted any discussion of surrounding facts).

C.    **Routine and Conservative Treatment**

Third, the ALJ noted that Ms. Sulok's treatment "has been essentially routine and conservative in nature." (R. 31). More specifically, the ALJ found that "[n]o further limitations are warranted because [Ms. Sulok] has not followed through with a more aggressive treatment protocol and has not complied with her treating physician's orders by completing physical therapy, etc.," and because Ms. Sulok declined to undergo a shoulder replacement surgery. (R. 31-32). However, the ALJ committed error here by failing to explain how he reached this conclusion in spite of the many pieces of evidence in the record that otherwise provide context for Ms. Sulok's "conservative" treatment. For example, elsewhere in his opinion, the ALJ himself noted that Ms. Sulok "was unable to have right shoulder surgery because the [second rotator cuff] tear was too severe," "reported that physical therapy was not working," and "had no change as a result in therapy." (R. 30). The record also contains notations from one of Ms. Sulok's treating physicians, Dr. Katherine Palmer, that Ms. Sulok's recurrent rotator cuff tear was so severe that she was not even a candidate for physical therapy in 2014. (R. 409, 412). Ms. Sulok confirmed these details at the hearing and additionally testified that she nonetheless resumed her most recently prescribed course of physical therapy after missing some of her sessions due to family issues. (R. 48). The ALJ made no mention of the fact that Ms. Sulok had returned to physical therapy and did not reconcile her lack of past success with or clinical inability to participate in physical therapy when he criticized her for failing to attend the same. Nor did the ALJ explain why Ms. Sulok should have elected to undergo another shoulder surgery after re-tearing her right rotator cuff in 2013, despite having been told by another one of her treating physicians, Dr. Henry Kim, that the tear might not be "amendable to primary care due to its massive size" and that her tear was too severe for surgical intervention. (R. 30, 252). Once

again, the ALJ impermissibly engaged in "cherry-picking" facts from the medical record to support his conclusions while ignoring evidence from the same record that supports Ms. Sulok's allegations. *See Denton*, 596 F.3d at 425; *see also Myles*, 582 F.3d at 678 ("It is not enough for the ALJ to address mere portions of a doctor's report.").

In addition, the ALJ failed to discuss the fact that Ms. Sulok could not procure some of her prescribed pain medications and had to discontinue seeing two separate treating physicians due to a lack of health care insurance. (R. 264, 362, 405). And, it was further noted in the medical records that financial barriers exist "that prevent patient goals from being met." (R. 414) Indeed, a claimant's inability to afford medication or doctors' visits can excuse the failure to seek such treatment. *Myles*, 582 F.3d at 677; *Roddy v. Astrue*, 705 F.3d 631, 638 (7th Cir. 2013) (noting that "the agency has expressly endorsed the inability to pay as an explanation excusing a claimant's failure to seek treatment") (citing SSR 96-7p). The ALJ's omission of these considerations requires remand. *See Craft*, 539 F.3d at 679 (remanding where the ALJ drew a negative inference from claimant's lack of medical care because she did not address evidence reflecting claimant's inability to pay for regular treatment or medicine); *see also Pierce v. Colvin*, 739 F.3d 1046, 1050 (7th Cir. 2014) (finding that the ALJ erred in discrediting the claimant based on an absence of objective support for the limitations where the claimant's lack of insurance prevented her from seeking medical attention).

## CONCLUSION

The remedy for the ALJ's shortcomings is further consideration, not the immediate award of benefits. And so, for the reasons stated herein, the Court **REVERSES** the Commissioner's decision and **REMANDS** this matter to the Commissioner for further proceedings consistent with this opinion.

SO ORDERED.

ENTERED: July 27, 2018

                                                      /s/ JON E. DEGUILIO
Judge
United States District Court